682 S.E.2d 566

**CAMDEN–CLARK MEMORIAL HOSPITAL ASSOCIATION, Plaintiff Below,**

v.

**ST. PAUL FIRE AND MARINE INSURANCE CO., Defendant Below,**

No. 33909.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 13, 2009.

Decided June 25, 2009.

Dino Colombo, Travis Mohler, Colombo &
Stuhr, PLLC, Morgantown, WV, Donna S.
Quesenberry, MacCorkle, Lavender, Casey &
Sweeney, PLLC, Charleston, WV, for Plaintiff.

D.C. Offutt, Jr., Perry W. Oxley, David E. Rich, Offutt Nord, PLLC, Huntington, WV, for Defendant.

BENJAMIN, Chief Justice.

This matter comes before this Court upon a request from the United States District Court for the Southern District to West Virginia to answer two certified questions.[1] By order dated February 20, 2008, the district court certified the following two questions to this Court:

1. Under West Virginia law, when an insured is found liable for a tort, and the complaint indicates that the tort could be based on conduct that the insurance policy covers, on conduct that the insurance policy does not cover, or both, and when the jury verdict does not specify which conduct gave rise to the insured's liability, does the insured bear the burden of proving that the liability was based on covered conduct, or does the insurer bear the burden of proving that the liability was based upon non-covered conduct?

2. Under West Virginia law, when a jury awards punitive damages against an insured, and the punitive damages could be based on a claim covered by the insurance policy, on a claim not covered by an insurance policy, or both, does the insured bear the burden of proving that the punitive damages were based upon a covered claim, or does the insurer bear the burden of proving that the punitive damages were based on a non-covered claim?

As set forth more fully below, we find that where an insurance policy does not impose a duty to defend upon the insurer and the insured is a sophisticated entity which has controlled the defense of the underlying claim, the burden of proof regarding allocation of a jury verdict between claims covered by the policy and claims not covered by the policy falls upon the insured.

## I.

## FACTUAL AND PROCEDURAL HISTORY

On December 1, 2006, Camden–Clark Memorial Hospital Corporation (hereinafter "Camden–Clark") instituted a declaratory judgment action in the United States District Court for the Southern District West Virginia seeking a declaration of insurance coverages available to satisfy a jury verdict in excess of Six Million Five Hundred Thousand Dollars ($6,500,000.00) rendered against it in the Circuit Court of Wood County, West Virginia, on March 10, 2006, in the matter of *Bernard R. Boggs, as Administrator of the Estate of Hilda Boggs, deceased as personal representative of the statutory beneficiaries of the wrongful death claim herein asserted and in his own right v. Camden–Clark Memorial Hospital Corporation, United Anesthesia, Inc. and Manish I. Koyawala, M.D.,* Civil Action No. 03–C–296. At issue in the district court action was a policy of insurance issued by St. Paul Fire and Marine Insurance Co. (hereinafter "St. Paul"), being policy number 566XM2102 and having a policy period of July 1, 1999, through July 1, 2002, (hereinafter "the policy").

### A. The Policy Provisions

The policy provided basic liability coverage and excess liability coverage.[2] The provisions governing the basic liability coverage provided for One Million Dollars ($1,000,000.00) in coverage for "medical professional injury," "bodily injury and property damage," "personal injury liability," and "advertising injury" and contained a Two Million Dollar ($2,000,000.00) self-insured retention[3]

---

1. Pursuant to West Virginia Code § 51–1A–3 (1996), this Court "may answer a question of law certified to it by any court of the United States ... if the answer may be determinative of an issue in a pending cause in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state."

2. We acknowledge that both the district court and the parties have referred to the basic liability

provisions and excess liability provisions as the "basic policy" and "excess policy." However, there is but one policy number and document at issue herein. Accordingly, we shall refer to the provisions as the "basic liability coverage" and the "excess liability coverage."

3. Under the policy provisions:

The self-insured retentions shown in the Coverage Summary and the information contained

(hereinafter "SIR"). The provisions governing the excess liability coverage provided for Fifteen Million Dollars ($15,000,000.00) of coverage for liabilities incurred in excess of those covered by the basic liability coverage. The only policy provisions at issue in this litigation are those applicable to coverage for medical professional liability claims. Under the policy's medical professional injury liability provisions, St. Paul agreed to pay "amounts any protected person is legally required to pay as damages for covered medical professional injury that results from health care professional services provided, or which should have been provided" by a protected person. As the policy does not contain an exclusion for punitive damages, the only policy exclusion relative to the instant matter is that for "bodily injury or property damages that's expected or intended by the protected person." Further, while the terms governing the basic liability coverage provisions give St. Paul "the right to investigate

or associate in the defense of any claim or suit for covered injury or damage made or brought against any protected person[,]" the policy did not require St. Paul to provide a defense.[4]

### B. The Underlying Medical Professional Liability Action

On June 30, 2003, Bernard R. Boggs instituted a medical professional liability action in the Circuit Court of Wood County, West Virginia, against Camden–Clark, United Anesthesia, Inc., and Manish Koyawala, M.D. (hereinafter "Dr. Koyawala") arising from the death of Hilda Boggs.[5] The complaint alleged that the various defendants breached the applicable standard of care resulting in the death of Hilda Boggs approximately one week after she was admitted to Camden–Clark Hospital where she underwent an open reduction and internal fixation of a left ankle fracture.[6] In addition to the medical profes-

in this section fix the amount [the insured will] be required to pay, and over which the limits of coverage of this agreement will apply. This is the amount [the insured will] be responsible for, regardless of the number of:
- protected persons;
- claims made or suits brought; or
- persons or organizations making claims or bringing suits.

Your self-insured retentions apply to damages, prejudgment interest, post-judgment interest, and claim expenses.

We'll consider any voluntary payment of, or assumption of any obligation to pay, the following above a self-retention without our consent to be your responsibility:
- Damages for covered injury or damage.
- Claim expenses.

\* \* \*

**Coverage above reduced or exhausted self-insured retentions.** We'll pay damages and claim expenses above reduced or exhausted self-insured retentions, but only if those self-insured retentions have been reduced or exhausted solely by your payment of damages, prejudgment interest, postjudgment interest, and claim expenses that result from injury or damage that would have been covered by this agreement. If you have made payments other than for payment of damages, prejudgment interest, postjudgment interest, and claim expenses that result from injury or damage covered by this agreement, such payments will not reduce the self-insured retentions over which this agreement applies.

The term "claim expenses" is defined in the policy to be; "the reasonable fees, costs, and expenses that result directly from the investigation, settlement, defense, or appeal of a specific

claim or suit by you." Excluded from the definition of "claim expenses" are "fees and expenses of independent adjusters or attorneys hired by a protected person" where such expenses "do not result directly from the investigation, settlement, defense, or appeal of a specific claim or suit[.]" The policy also contains provisions giving St. Paul approval authority over Camden–Clark's claims handling procedures and requiring periodic reporting on all pending claims falling within the SIR.

4. Under the basic liability provisions of the policy, St. Paul has "no duty to investigate or defend any claim or suit or perform other acts or services under this agreement, even if the amount of damages or claim expenses exceeds the self-insured retention that applies." Under the excess liability provisions of the policy, St. Paul has "no duty to defend any protected person against a claim or suit if [Camden–Clark's] Basic insurance, or any other insurance, has a duty to defend that protected person. However, we'll have the right to associate in the defense and control of any claim or suit that is reasonably likely to involve [St. Paul]."

5. In actuality, three related complaints were filed by Mr. Boggs. However, the action which proceeded to trial was the action filed on June 30, 2003.

6. Specifically, the complaint alleged that the defendants were negligent and failed to exercise reasonable care by the oversedation of Hilda Boggs prior to administration of anesthesia, the inappropriate dosing of hyperbolic lidocaine, and inadequate monitoring of Hilda Boggs.

sional liability claim, claims asserted against Camden–Clark included negligent hiring, retention and credentialing of Dr. Koyawala, spoliation of evidence, fraudulent concealment, and outrage. More specifically, the complaint alleged that "[t]he Defendants, Manish I. Koyawala and Camden–Clark, during and following the treatment or lack thereof to Hilda Boggs at Camden–Clark, encouraged others to withhold information, make false statements, coordinate 'stories' and destroy, despoil, modify or fabricate relevant evidence." It was alleged that Dr. Koyawala's conduct "in not only causing the death of Hilda Boggs, but in directly misleading her widower regarding the circumstances of that death was outrageous and insulting, caused the Plaintiff severe emotional distress and was of such a character that no reasonable person could be expected to endure it." The complaint further asserted that Camden–Clark was vicariously liable for the acts of Dr. Koyawala and that an award of punitive damages was appropriate due to acts and omissions "so willful, wanton, intentional and outrageous" that punitive damages were necessary "in order to punish the Defendants and to deter them and others from engaging in similar conduct in the future."

The underlying action [7] proceeded to trial on March 1, 2006.[8] On March 10, 2006, the jury returned a verdict against Camden–Clark awarding compensatory and punitive damages in the total amount of Six Million Five Hundred Forty–Five Thousand Dollars ($6,545,000.00) upon findings of fraudulent concealment, negligence and vicarious liability. The jury verdict form required the jury to answer numerous questions and allocate the awarded damages among the various theories of liability. However, the jury verdict form did not ask the jury to differentiate as to whether liability was being imposed for negligent or intentional conduct.[9] By order

7. During its pendency, the underlying action was before this Court on several occasions regarding issues unrelated to the instant matter resulting in one issued opinion and several rejected petitions for appeal.

8. Dr. Koyawala and United Anesthesia settled the claims asserted against them prior to trial. Accordingly, the only claims to be resolved at trial were those asserted against Camden–Clark, including the vicarious liability claims.

9. The jury verdict form, including the jury's responses to the questions contained therein states:

**Fraudulent Concealment**

1. Do you find that Camden–Clark Memorial Hospital Fraudulently concealed information about Hilda Boggs' death from Ray Boggs?

 __X__ YES _____ NO

a. What damages do you find resulted to Ray Boggs as a result of the fraudulent concealment?

 I. Ray Boggs $100,000.00

2. Do you find that Camden–Clark Memorial Hospital's conduct toward Ray Boggs was so outrageous that a reasonable person could not have been expected to endure it?

 __X__ YES _____ NO

a. What damages to you find resulted to Ray Boggs for the emotional distress that he has suffered, or will suffer in the future for Camden–Clark's outrageous conduct toward him?

 I. Ray Boggs—past emotional
 distress $250,000.00

 II. Ray Boggs—future emotional
 distress $125,000.00

**Negligence of Camden–Clark Memorial Hospital**

3. Do you find that Camden–Clark Memorial Hospital was negligent toward Hilda Boggs?

 __X__ YES _____ NO

a. Do you find that Camden–Clark Memorial Hospital's negligence was a proximate cause of Hilda Bogg's death?

 __X__ YES _____ NO

If you answer "yes" to question 3a, you *must* determine damages for each Person listed in question 6.

**Negligent Credentialing of Mr. Koyawala**

4. Do you find that Camden–Clark Memorial Hospital was negligent in credentialing Dr. Koyawala *or* Evelyn Melvin for allowing them to practice at the Hospital?

 _____ YES __X__ NO

a. Do you find that Camden–Clark Memorial Hospital's negligence in credentialing Kr. Koyawala *or* Evelyn Melvin was a proximate cause of Hilda Bogg's death?

 _____ YES __X__ NO

If you answer "yes" to question 4a, you *must* determine damages for each Person listed in question 6.

**Negligence of Dr. Koyawala or Evelyn Melvin**

5. Do you find that Dr. Koyawala *or* Evelyn Melvin were negligent toward Hilda Boggs?

 __X__ YES _____ NO

dated April 28, 2006, the circuit court entered judgment in the amount of Four Million Eight Hundred Thirty Four Thousand Three Hundred and Eighty Dollars ($4,834,380.00) against Camden–Clark. This amount represented the jury's verdict, plus pre-judgment interest, less the amount of punitive damages awarded against Dr. Koyawala and Evelyn Melvin,[10] and less a set-off for the amount of proceeds remaining from the settlements with Dr. Koyawala and United Anesthesia, Inc. after satisfaction of the punitive damage award based upon their conduct.[11]

### C. The Instant Coverage Litigation

On December 27, 2005, four years after initially receiving notice of a potential claim and more than two years after the underlying complaint was filed St. Paul issued its first and only pre-trial reservation of rights letter regarding coverages applicable to the Boggs' suit. In that letter, St. Paul acknowledged that the Boggs' suit "alleged causes of action for negligent medical care and spoliation of evidence" and sought "both compensatory and punitive damages." After reciting various policy provisions, the letter indicated that coverage would not exist under the policy for the spoliation of evidence cause of action and disclaimed "any damages awarded to the Plaintiffs pursuant to their cause of action for spoliation of evidence."[12] The letter continued by stating "[w]e note that the

a. Do you find that the negligence of Dr. Koyawala *or* Evelyn Melvin was a proximate cause of Hilda Bogg's death?

 X YES NO

If you answer "yes" to question 5a, you *must* determine damages for each Person listed in question 6.

**Damages for Wrongful Death**

6. **If you have answered "yes" to question 3a *or* 4a *or* 5a,** what damages do you find resulted to Ray Boggs (Mrs.. Boggs' widower), Kenny Boggs (Mrs. Boggs' son), Maggie Stump (Mrs. Boggs' mother), Randy Stump (Mrs. Boggs' brother), and Gary Stump (Mrs. Boggs' brother) as a result of Mrs. Boggs' wrongful death?

a. Ray Boggs' loss of income and household services $650,000.00

b. Ray Boggs' loss of consortium and solace $350,000.00

c. Kenny Boggs' loss of income and household services ----------------

d. Kenny Boggs' loss of comfort, society and solace $500,000.00

e. Maggie Stumps' loss of comfort, society and solace $ 50,000.00

f. Randy Stumps' loss of comfort, society and solace $ 10,000.00

g. Gary Stumps' loss of comfort, society and solace $ 10,000.00

**Actual or Apparent Agency of Dr. Koyawala or Evelyn Melvin or UAI**

7. Do you find that Dr. Koyawala *or* Evelyn Melvin, *or* United Anesthesia, Inc. were *actual* agent [sic] of Camden–Clark Memorial Hospital?

 YES X NO

8. Do you ·find that Dr. Koyawala *or* Evelyn Melvin, *or* United Anesthesia, Inc. were *apparent* agents of Camden–Clark Memorial Hospital?

 X YES NO

9. Do you find from a preponderance of the evidence that Dr. Koyawala failed to properly disclose to Hilda Boggs the risks associated with her spinal anesthesia?

 X YES NO

10. Do you find from a preponderance of the evidence that a reasonable person in Hilda Boggs' position would have refused to undergo the September, 2001 spinal anesthesia if she had been properly informed about the risks associated with that procedure?

 YES X NO

If you answer "yes" to questions 9 *and* 10, you *must* determine damages for each person listed in question 6.

11. Do you find that conduct of Camden–Clark Memorial Hospital separate and apart from any conduct of Dr. Koyawala or Evelyn Melvin was so outrageous, wrongful or intentional that punitive damages should be awarded?

 X YES NO

11(a) What amount of punitive damages do you award against Camden–Clark Memorial Hospital?
$3,000,000.00

12. Do you find that the negligence of Dr. Koyawala or Evelyn Melvin was so excessive, reckless or aggravated that punitive damages should be awarded?

 X YES NO

12(a) What amount of punitive damages do you award against Dr. Koyawala or Evelyn Melvin?
$1,500,000.00

10. Evelyn Melvin was a certified registered nurse anesthetist.

11. Both the underlying verdict and a subsequent award of attorneys' fees as a sanction for litigation conduct were appealed to this Court. Those appeals were rejected.

12. The spoliation of evidence claim was abandoned prior to trial and not presented to the jury.

Plaintiffs' complaint seeks both compensatory and punitive damages. Please note that St. Paul reserves its right to deny indemnification for any punitive damages which are awarded to the Plaintiff because of intentional acts by the named insured and/or which arise from non-covered damages such as spoliation of evidence." St. Paul did not exercise its policy right to participate in the defense of Camden–Clark during the trial of the underlying action or at any time prior to trial.[13] Camden–Clark was represented throughout the underlying litigation by an attorney it selected and retained for its defense. After entry of the judgment order, Camden–Clark requested indemnification from St. Paul under both the basic liability coverage and excess liability coverage provisions of the policy.

In response to that request, St. Paul retained an outside attorney to perform an "interim coverage analysis." In the July 18, 2006, letter provided to Camden–Clark outlining St. Paul's coverage position based upon that analysis, St. Paul acknowledged coverage for claims arising from medical professional negligence. However, St. Paul declined to provide coverage for damages arising from fraudulent concealment or based upon the "tort of outrage." Ultimately, the letter concluded that St. Paul had no payment obligations because any damage award based upon medical negligence would go toward exhaustion of the SIR and all other awards were excluded from coverage.[14]

Camden–Clark responded to this coverage decision by letter dated October 20, 2006. In this letter, Camden–Clark argued that the claims for fraudulent concealment and "tort of outrage" were not necessarily excluded from coverage because such damages may be awarded under West Virginia law without a finding of intentional conduct which would be required under the policy to exclude coverage.[15] Additionally, they contend that as punitive damages were not excluded from the policy, they may be covered under West Virginia law. Camden–Clark also took issue with the manner with which St. Paul calculated off-sets to covered damages. After asking St. Paul to reconsider its coverage position, Camden–Clark indicated that it would file a declaratory judgment action to determine applicable coverages if necessary. Ultimately, the instant declaratory judgment action was filed in the United States District Court for the Southern District of West Virginia.

Camden–Clark moved for summary judgment before the district court arguing that all awarded damages were covered under the policy because the tort of outrage may be based upon negligent and/or intentional conduct and the jury made no findings regarding the intentional nature of Camden–Clark's action. Further, Camden–Clark argued that the jury made no finding as to whether the punitive damages awarded against Camden–Clark were based upon intentional rather than negligent or other conduct.

---

**13.** Based upon representations made by Camden–Clark in pleadings before both the district court and this Court, it appears that Camden–Clark initially reported a potential claim arising from Mrs. Boggs' death to St. Paul in October 2001, and requested St. Paul provide coverage upon the filing of the underlying action. Additionally, Camden–Clark placed St. Paul on notice that the claim could exceed the SIR in June 2002. It also appears that St. Paul was kept apprised of the on-going litigation throughout the pendency of the same consistent with the policy's claim handling terms. St. Paul does not appear to contradict these representations by Camden–Clark anywhere in the record before this Court.

**14.** The letter did not address the reduction of the SIR by claims expenses incurred by Camden–Clark as was apparently required under the plain terms of the policy.

**15.** This Court recognized a cause of action for emotional distress, otherwise known as the tort of outrage in *Harless v. First National Bank of Fairmont*, 169 W.Va. 673, 289 S.E.2d 692 (1982). In syllabus point six of *Harless*, we held "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress[.]" Syl. pt. 6, in part, *Harless*, 169 W.Va. 673, 289 S.E.2d 692. Accordingly, liability may be imposed for intentional *or* reckless conduct. *See also*, syl. pt. 3, in part, *Travis v. Alcon Laboratories, Inc.*, 202 W.Va. 369, 504 S.E.2d 419 (1998) (one of the elements a plaintiff must prove to prevail on a claim for intentional or reckless infliction of emotional distress is "that the defendant acted with intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct[.]").

St. Paul responded by arguing that as both the plaintiff and insured, Camden–Clark bore the burden of demonstrating that the tort of outrage and punitive damages claims came within policy coverage. According to St. Paul, the allegations involving the tort of outrage had nothing to do with medical professional liability and, therefore, Camden–Clark did not set forth a prima facie demonstration of coverage such that an analysis of the intentional acts exclusion would even be relevant. Further, St. Paul argued that the facts clearly demonstrated that the punitive damages award arose from improper conduct in the handling, destruction and falsification of documents. Camden–Clark replied by asserting that St. Paul failed to demonstrate that the tort of outrage did not fall within the insurance agreement because under the express terms of the insuring agreement, the tort of outrage claim "results from" health care professional services. Camden–Clark further noted that St. Paul never requested special interrogatories be submitted to the jury to differentiate between awards based upon intentional versus negligent or other conduct such that findings necessary to invoke the intentional act exclusion could be made by the fact-finder.

Finding no clear guidance under our existing law as to the burdens borne by an insured and insurer to allocate a jury verdict between covered and non-covered claims, the district court found it appropriate to certify the issue to this Court. Specifically, the district court found West Virginia law was unclear as to the appropriate burdens of demonstrating coverage borne by an insurer and an insured where "an insurer monitors the case but has no duty to defend, and where a jury verdict is ambiguous." The district court's certification order acknowledged that a determination of the appropriate burdens would be determinative of the coverage issue in this litigation because "it would be impossible for the party bearing the burden of proof to meet its burden[.]" Accordingly, in an order dated February 20, 2008, the district court asked this Court to answer the following two questions:

1. Under West Virginia law, when an insured is found liable for a tort, and the complaint indicates that the tort could be based on conduct that the insurance policy covers, on conduct that the insurance policy does not cover, or both, and when the jury verdict does not specify which conduct gave rise to the insured's liability, does the insured bear the burden of proving that the liability was based on covered conduct, or does the insurer bear the burden of proving that the liability was based upon non-covered conduct?

2. Under West Virginia law, when a jury awards punitive damages against an insured, and the punitive damages could be based on a claim covered by the insurance policy, on a claim not covered by an insurance policy, or both, does the insured bear the burden of proving that the punitive damages were based upon a covered claim, or does the insurer bear the burden of proving that the punitive damages were based on a non-covered claim?

On April 3, 2008, the Court granted the district court's request.

## II.

## STANDARD OF REVIEW

It is well-established that "[a] de novo standard is applied by this Court in addressing the legal issues presented by a certified question from a federal district or appellate court." Syl. pt. 1, *Light v. Allstate Ins. Co.*, 203 W.Va. 27, 506 S.E.2d 64 (1998). *See also*, Syl. pt. 1, *Bower v. Westinghouse Elect. Corp.*, 206 W.Va. 133, 522 S.E.2d 424 (1999) ("This Court undertakes plenary review of legal issues presented by certified question from a federal district or appellate court."). Thus, we shall proceed giving plenary review to the matters raised by the district court's certified questions.

## III.

## DISCUSSION

Before this Court, the parties have expounded somewhat on the arguments they presented to the district court. In addition to its arguments before the district court, Camden–Clark argues that the while an in-

sured often bears the burden of apportioning a verdict between covered and non-covered claims, circumstances exist where that burden should be placed on the insurer, such as where the insurer failed to fulfill its duty to defend or failed to advise its insured that the insured needed to seek an allocated verdict in order to determine covered damages. Invoking West Virginia's well-established public policy imposing a duty of good-faith and fair dealing upon an insurer [16], Camden–Clark argues that an insurer having no duty to defend who actively monitors a claim including both covered and non-covered components has an obligation to inform the insured of the need for an allocated verdict. Relying on principles of waiver and estoppel, Camden–Clark maintains that the insurer should bear the burden of allocating the verdict between covered and non-covered claims in any subsequent coverage litigation where the insurer fails to inform the insured that coverage will be denied absent an appropriately allocated verdict.[17] In addition to responding to the arguments made by Camden–Clark, St. Paul focuses its argument before this Court upon a plaintiff's ordinary burden to prove each element of its claim by a preponderance of evidence and an insured's duty to set forth a *prima facie* showing that a claim fails within the terms of a policy in order to proceed in a coverage dispute.[18] Having thoroughly considered the parties' arguments regarding the appropriate burden of proof, we turn to the questions certified by the district court.

 Certain principles governing insurance coverage litigation are well-established in this jurisdiction. In actions to determine applicable coverages under a policy of insur-

ance, this Court has noted that "[u]nder West Virginia law, the plaintiffs must prove both the existence of an applicable insurance contract and its material terms. It is only when the plaintiffs have established a prima facie case of coverage that the burden of production shifts to the defendants." *Payne v. Weston*, 195 W.Va. 502, 506, 466 S.E.2d 161, 165 (1995); *see also,* syl. pt. 1, *Jarvis v. Pennsylvania Cas. Co.*, 129 W.Va. 291, 40 S.E.2d 308 (1946) ("Where, in an action upon a policy of insurance, insured has made out a prima facie case of loss within the coverage provided by the policy, the burden is upon the insurer to prove the affirmative defense that the loss is one for which the insurer is not liable because it comes within an exception in the policy."). Thus, where an insured institutes a declaratory judgment action to determine the scope of coverage afforded by a policy of insurance, the burden shifts to the insurer to demonstrate an applicable exclusion once a prima facie case is established that a claim may fall within scope of the policy's coverage. "An insurance company seeking to avoid liability through the operation of an exclusion has the burden of proving the facts necessary to the operation of that exclusion." Syl. pt. 7, *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488 (1987), *modified on other grounds by, Potesta v. U.S. Fid. & Guar. Co.*, 202 W.Va. 308, 504 S.E.2d 135 (1998). Further, "[w]here the policy language involved is exclusionary, it will be strictly construed against the insurer in order that the purpose of providing indemnity not be defeated." Syl. pt. 5, *McMahon*, 177 W.Va. 734, 356 S.E.2d 488. *See also, Russell v. Bush & Burchett, Inc.*, 210 W.Va. 699, 705, 559

---

16. *See,* Syl. pt. 4, *Shamblin v. Nationwide Mut. Ins. Co.*, 183 W.Va. 585, 396 S.E.2d 766 (1990).

17. Camden–Clark likewise argues that the reservation of rights letter issued by St. Paul which focused on the spoliation of evidence claim which was not submitted to the jury constituted inadequate notification of St. Paul's coverage position with respect to the remaining claims, particularly claims based upon the tort of outrage.

18. St. Paul also spends an inordinate amount of time arguing the underlying coverage issue to this Court and making allegations regarding the

manner in which the underlying claims were litigated. Those issues are not properly before this Court as the certified questions focused solely on the parties' respective burdens. Indeed, any issues regarding Camden–Clark's litigation conduct were previously resolved by this Court when it declined to review the trial court's imposition of sanctions for the same. To be clear, this Court is taking no position on the extent to which the underlying verdict is covered under the St. Paul policy, if at all. Rather, we limit our review to answering the narrow questions posed by the district court, *i.e.,* the parties' respective burdens.

S.E.2d 36, 42 (2001) (setting forth insurer's duties).

Our law regarding the shifting burdens of proof governing insurance coverage disputes is consistent with the majority rule. The majority rule governing the burden of proof applicable to coverage disputes arising from a judgment entered against an insured based upon both covered and non-covered claims has been summarized by one authority in the following manner:

> the burden of proof should be the same as when coverage is challenged in any other context. The insured should bear the burden of first demonstrating the existence of coverage under the general insuring clause; that is, the insured should first demonstrate that, assuming no exclusions are applicable, all or a *portion of the judgment* is encompassed by the policy. The insurer should then have the burden of proving the applicability of a policy exclusion.

Allan D. Windt, *Insurance Claims & Disputes* § 6:27 (5th ed.2008) (footnotes omitted).

 It is likewise well established under our law that an insurer's duty to defend is broader than its duty to indemnify. Where a policy of insurance contains a duty to defend, West Virginia law ordinarily imposes a duty upon an insurer to defend its insured even where some claims may not be covered by the terms of the policy. As this Court stated in *Aetna Casualty v. Pitrolo*, 176 W.Va. 190, 194, 342 S.E.2d 156, 160 (1986):

> As a general rule, an insurer's duty to defend is tested by whether the allegations in the plaintiff's complaint are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policy. There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage. Furthermore, it is generally recognized that the duty to defend an insured may be broader than the obligation to pay under a particular policy. This ordinarily arises by virtue of language in the ordinary liability policy that obligates the insurer to defend even

though the suit is groundless, false, or fraudulent.

(internal quotations and citations omitted). Policies of insurance containing duty to defend provisions may arguably impose higher duties upon insurers to protect the interests of their insureds than policies containing only a duty to pay due to the insurer's duty to defend both covered and non-covered claims. For example, had the St. Paul policy contained a duty to defend, St. Paul would have been obligated to provide a defense for Camden–Clark in the underlying litigation because the underlying complaint contained claims of medical professional liability which St. Paul conceded are covered by the policy. St. Paul did not have a duty to defend due to the policy's SIR provisions under which Camden–Clark retained significant control over the defense of the underlying claims.

The existence of the SIR, including any provision impacting the insurer's duty to defend, necessarily impacts the burden of allocating a judgment between covered and non-covered claims due to the impact the duty to defend has on allocation disputes. In *Magnum Foods, Inc. v. Continental Casualty Company*, 36 F.3d 1491 (10th Cir.1994) (applying Oklahoma law), the Tenth Circuit Court of Appeals discussed the relationship between an insurer's duty to defend and subsequent coverage litigation to determine proper apportionment of a jury verdict. Therein, the court explained:

> As an initial matter, we note that an insurer who undertakes the defense of a suit against its insured must meet a high standard of conduct. *Duke v. Hoch*, 468 F.2d 973, 978 (5th Cir.1972); *Gay & Taylor, Inc. v. St. Paul Fire & Marine Ins. Co.*, 550 F.Supp. 710, 714–16 (W.D.Okla. 1981). The right to control the litigation carries with it certain duties. *Traders & Gen. Ins. Co. v. Rudco Oil & Gas Co.*, 129 F.2d 621, 627 (10th Cir.1942). One of these is the duty not to prejudice the insured's rights by failing to request special interrogatories or a special verdict in order to clarify coverage of damages. *See Gay & Taylor*, 550 F.Supp. at 716. The reason for this is that when grounds of liability are asserted, some of which are

covered by insurance and some of which are not, a conflict of interest arises between the insurer and the insured. If the burden of apportioning damages between covered and non-covered were to rest on the insured, who is not in control of the defense, the insurer could obtain for itself an escape from responsibility merely by failing to request a special verdict or special interrogatories. *Duke*, 468 F.2d at 979. The insurer is in the best position to see to it that the damages are allocated; therefore, it should be given the incentive to do so.

*Magnum Foods*, 36 F.3d at 1498–99. Finding that the insurer controlled the insured's defense in the underlying litigation, the Tenth Circuit concluded the insurer bore the burden of demonstrating the basis of the jury's award. *Id.* at 1499. Similarly, the Arkansas Supreme Court has found that while the insured ordinarily bears the burden of allocating liability for a jury verdict between covered and non-covered claims, that burden shifts to an insurer who has assumed the defense of the underlying claim. *MedMarc Cas. Ins. Co. v. Forest Healthcare, Inc.*, 359 Ark. 495, 199 S.W.3d 58, 61–62 (2004). In *MedMarc*, the court noted:

> Most courts have held that the burden is on the insured. An exception, however, should be made to that rule in those cases in which the circumstances surrounding the defense of the underlying action were such that the insurer was obligated to seek an allocated verdict or advise the insured of the need for one, but failed to fulfill that obligation. In that event, the burden of persuasion should be placed on the insurer.

*MedMarc*, 199 S.W.3d at 61–62, *quoting*, Allan D. Windt, *Insurance Claims & Disputes* § 6.27 (4th ed.2001).

 This Court has previously recognized that an insurer's duty toward an insured with respect to notifications regarding available coverages may vary depending upon the situation presented. For example, an insurer does not have an affirmative duty to notify its insured of the existence of underinsured motorist coverage or advise of consent to settle obligations. Syl. Pt. 8, *Kronjaeger v.*

*Buckeye Union Ins. Co.*, 200 W.Va. 570, 490 S.E.2d 657 (1997). In *Kronjaeger*, we noted:

> we [could] find no authority requiring an insurer to notify its insured of available coverage following notification of a loss or to advise its insured as to the limits of coverage. In some situations, we have required an insurer to provide its insured with notice of the cancellation of an insurance policy, or to inform its insured that it will deny coverage[.] Both of those scenarios, though, involve an affirmative action on the part of the insurer in dealing with a policy of insurance that will have a potentially detrimental impact upon its insured: an affirmative decision to cancel an insurance policy or an affirmative decision to deny coverage.... To require an insurer to inform an insured about [non-mandatory underinsured] coverage the insured him/herself purchased is nothing short of absurd.

*Kronjaeger*, 200 W.Va. at 586–7, 490 S.E.2d at 673–4 (internal citations omitted). In light of both our precedent and the authorities cited above, we believe that the insured's ordinary burden to allocate a verdict between covered and non-covered claims does not shift to an insurer unless the insurer has an affirmative duty to defend the insured under the policy terms.

 It appears that businesses are increasingly utilizing insurance policies with large self-insured retentions so as to have better control over the defense of claims asserted against them. Indeed, the SIR provision in the policy before this Court allows Camden–Clark to control the claims handling and defense of all claims asserted against it. While the policy provides St. Paul the option to join in the defense of claims that may exceed the SIR limits, it imposes no duty upon St. Paul to defend. Without an affirmative duty to act or duty defend the underlying claim, there is no justification for shifting the burden to allocate the jury verdict between covered and non-covered claims from the insured to the insurer. However, a different circumstance may exist where the policy does not impose a duty to defend but the insured, recognizing the potential for a verdict in excess of the SIR limits, requests

the insurer to participate in the defense. In such a circumstance, if the insurer affirmatively chooses not to participate in the defense, it should not be permitted to complain that the jury verdict is not allocated between covered and non-covered claims because it was given the option of participating, including the attendant opportunity to request an allocated verdict and refused.

Accordingly, we now hold that where a policy of insurance does not impose a duty to defend upon the insurer and the insured has controlled the defense of the underlying claims, if a court determination regarding allocation of a jury verdict between the claims covered by the terms of the policy and the claims not covered by the terms of the policy is sought, the insured has the burden of proof to establish proper allocation. Similarly, in order to obtain indemnification under a policy of insurance which does not exclude punitive damages and under which there is no duty to defend, an insured who has controlled the defense in a case resulting in a punitive damage award and who seeks a court determination regarding allocation of the award has the burden of proving that the claim or claims on which the punitive damage award is based is covered by the terms of the policy.

## IV.

## CONCLUSION

For the reasons set forth above, we answer the questions certified by the United States District Court for the Southern District of West Virginia in the following manner:

1. Under West Virginia law, when an insured is found liable for a tort, and the complaint indicates that the tort could be based on conduct that the insurance policy covers, on conduct that the insurance policy does not cover, or both, and when the jury verdict does not specify which conduct gave rise to the insured's liability, does the insured bear the burden of proving that the liability was based on covered conduct, or does the insurer bear the burden of proving that the liability was based upon non-covered conduct?

 *Answer:* Where a policy of insurance does not impose a duty to defend upon the insurer and the insured has controlled the defense of the underlying claims, if a court determination regarding allocation of a jury verdict between the claims covered by the terms of the policy and the claims not covered by the terms of the policy is sought, the insured has the burden of proof to establish proper allocation.

2. Under West Virginia law, when a jury awards punitive damages against an insured, and the punitive damages could be based on a claim covered by the insurance policy, on a claim not covered by an insurance policy, or both, does the insured bear the burden of proving that the punitive damages were based upon a covered claim, or does the insurer bear the burden of proving that the punitive damages were based on a non-covered claim?

 *Answer:* In order to obtain indemnification under a policy of insurance which does not exclude punitive damages and under which there is no duty to defend, an insured who has controlled the defense in a case resulting in a punitive damage award and who seeks a court determination regarding allocation of the award has the burden of proving that the claim or claims on which the punitive damage award is based is covered by the terms of the policy.

**Certified Questions Answered**